IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| YADKIN RIVERKEEPER, INC., and WATERKEEPER ALLIANCE, INC. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:14-cv-753 |
| DUKE ENERGY CAROLINAS, LLC, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiffs Yadkin Riverkeeper, Inc., and Waterkeeper Alliance, Inc., (collectively, "Riverkeepers") bring this citizen enforcement action against Defendant Duke Energy Carolinas, LLC, ("Duke Energy") alleging violations of the Clean Water Act of 1972 at Duke Energy's Buck Steam Station power plant. Before the Court are Duke Energy's Motion to Dismiss Plaintiffs' Complaint with Prejudice (ECF No. 20) and its Motion to Stay (ECF No. 21). The Court heard oral argument on August 5, 2015.[1] For the reasons below, the Court denies Duke Energy's motions.

I. **BACKGROUND**

A. **Clean Water Act**

In 1972, Congress enacted the Clean Water Act ("CWA" or "Act") "to restore and

---

[1] The Court decided four additional motions at oral argument. The Court granted Duke Energy's two Motions for Judicial Notice (ECF Nos. 22, 40), denied the Riverkeepers' Motion to Strike in Part Defendant's Reply in Support of Motion to Stay (ECF No. 33), and granted the Riverkeepers' Motion for Leave to File a Surreply to Defendant's Reply in Support of Motion to Stay (ECF No. 35). In deciding Duke Energy's Motion to Stay, the Court will thus consider Duke Energy's reply in its entirety, as well as the Riverkeepers' surreply.

maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2012). The Act prohibits "the discharge of any pollutant by any person" into the waters of the United States, except as in compliance with certain provisions of the Act. Id. § 1311(a).[2] To comply, pollutant dischargers can obtain a permit through the National Pollutant Discharge Elimination System ("NPDES") permit program, administered by the Environmental Protection Agency ("EPA") and authorized states. See id. § 1342(a)–(b). The agency responsible for issuing NPDES permits in North Carolina is the Department of Environment and Natural Resources ("DENR"). See N.C. Gen. Stat. § 143B-282(a)(1)(a). "NPDES permits impose limitations on the discharge of pollutants, and establish related monitoring and reporting requirements, in order to improve the cleanliness and safety of the Nation's waters." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 174 (2000). "Noncompliance with a permit constitutes a violation of the Act." Id.; see 40 C.F.R. § 122.41(a) (2015).

"[P]rimary responsibility for enforcement rests with the state and federal governments . . . ." Piney Run Pres. Ass'n v. Cty. Comm'rs, 523 F.3d 453, 456 (4th Cir. 2008) (quoting Sierra Club v. Hamilton Cty. Bd. of Cty. Comm'rs, 504 F.3d 634, 637 (6th Cir. 2007)). To ensure "a second level of enforcement," the Act's citizen suit provision, 33 U.S.C. § 1365, authorizes citizens "to bring suit against any NPDES permit holder who has allegedly violated its permit." Piney Run, 523 F.3d at 456 (quoting Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 152 (4th Cir. 2000) (en banc)). Citizen suits are meant "to supplement rather than to supplant governmental action," allowing citizens "to abate pollution when the government cannot or will not command compliance."

---

[2] The CWA prohibits the discharge of pollutants to "navigable waters," see 33 U.S.C. § 1311(a), 1362(12)(A), which are defined as "the waters of the United States," id. § 1362(7).

*Id.* (quoting Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 60, 62 (1987)). To that end, citizen suits are subject to two statutory limitations. First, a would-be plaintiff must give sixty days' notice to the EPA, the state, and the alleged violator of its intent to sue. 33 U.S.C. § 1365(b)(1)(A). The notice requirement provides the opportunity for the government to initiate its own enforcement action against the alleged violator and for the alleged violator "to bring itself into complete compliance with the Act," both obviating the need for a citizen suit. See Gwaltney, 484 U.S. at 59–60. Second, citizen suits are barred if the EPA or state is "diligently prosecuting" a civil or criminal enforcement action against the alleged violator in a federal or state court. 33 U.S.C. § 1365(b)(1)(B).

### B. Buck Steam Station

Duke Energy is "engaged in the generation, transmission, distribution, and sale of electricity" in North Carolina. (Compl. ¶ 23, ECF No. 1.) It owns and operates a power plant at Buck Steam Station ("Buck"), located on the banks of the Yadkin River. (Id. ¶ 29.) From 1926 to 2013, Duke Energy generated electricity at Buck by burning coal, a process that produces substantial amounts of coal combustion residuals, or coal ash.[3] (Id. ¶¶ 30–31.) For nearly ninety years, Duke Energy disposed of this coal ash in three coal ash lagoons at the Buck site. (Id. ¶¶ 31–32.) The lagoons are unlined, span approximately 170 acres, and contain 1.5 billion gallons of coal ash and contaminated wastewater. (Id. ¶ 32.)

In 1976, Duke Energy obtained a NPDES permit ("Buck Permit") to discharge pollutants at Buck, and it has continuously renewed the permit since that time. (DENR's

---

[3] "Coal combustion residuals" include fly ash, bottom ash, boiler slag, and flue gas desulfurization materials generated from the combustion of coal. 80 Fed. Reg. 21,302, 21,303 (Apr. 17, 2015) (to be codified at 40 C.F.R. pts. 257, 261); see N.C. Gen. Stat. § 130A-290(a)(2b). "Coal combustion residuals" are commonly referred to as "coal ash." Coal Ash (Coal Combustion Residuals, or CCR), U.S. Envtl. Prot. Agency, http://www2.epa.gov/coalash (last visited Oct. 20 , 2015). Because the parties use the term "coal ash" throughout their arguments, the Court will do likewise.

Compl. ¶¶ 65–66, ECF No. 20-2.) The current Buck Permit is effective from January 2012 to August 2016. (Buck Permit 1, ECF No. 30-9.) The permit authorizes Duke Energy to "discharge wastewater" from Buck into the Yadkin River "in accordance with effluent limitations, monitoring requirements, and other conditions" set forth in the permit. (Id.) Specifically, the permit authorizes Duke Energy to discharge "once-through non-contact cooling water through outfall 001, treated wastewater from the ash basin through outfall 002, and yard sump overflows through outfall 002A." (Id. at 2.)

### C. State Court Enforcement Action

On August 16, 2013, DENR filed a civil enforcement action against Duke Energy in state court. (DENR's Compl., ECF No. 20-2.) The DENR Complaint alleges violations of state environmental laws and groundwater regulations at six facilities, including Buck. (See id. ¶¶ 42–190.) The DENR Complaint identifies "seeps" at Buck to include "engineered discharges from the toe-drains of its Ash Basin and Ash Settling Ponds, which are different locations from the outfalls described in the Buck Steam Station NPDES Permit." (Id. ¶ 80.) The complaint states, "A seep or discharge from the Ash Basin, the Ash Settling Ponds or any other part of the Buck Steam Station that is not included in the Buck Steam Station NPDES Permit is an unpermitted discharge in violation of N.C. Gen. Stat. § 143-215.1(a)(1) and (a)(6)." (Id. ¶ 81; see id. ¶ 192.) The DENR Complaint further alleges that Duke Energy's "exceedances" of state groundwater standards for certain substances "at or beyond the compliance boundary of the Ash Basin and the Ash Settling Ponds at Buck Steam Station, are violations of the groundwater standards as prohibited by 15A NCAC 2L.0103(d)." (Id. ¶ 88; see id. ¶ 193.) In May 2014, the court granted the Riverkeepers' motion to intervene in DENR's state enforcement action. (Order 1, ECF No. 22-3.) The

4

Riverkeepers have full rights of participation as a party, including the right to conduct discovery. (Id. at 2.)

### D. Riverkeepers' Complaint

On September 3, 2014, the Riverkeepers filed suit in this Court, seeking "to enforce Permit requirements and Clean Water Act violations that DENR's Complaint does not seek to enforce." (Compl. ¶ 11, ECF No. 1.) The Riverkeepers assert four claims for relief: the Seep Claim, Hydrological Connection Claim,[4] Removed Substances Claim, and Dam Safety Claim.

Seep Claim: The Riverkeepers first claim that Duke Energy has violated the Buck Permit by making unauthorized discharges of pollutants. The Buck Permit authorizes Duke Energy to discharge wastewater into the Yadkin River through three outfalls. (Buck Permit 2, ECF No. 30-9.) Beyond these authorized discharges, the Riverkeepers allege that Duke Energy is making additional, unpermitted discharges through engineered seeps, non-engineered seeps, and an unpermitted pipe, all in violation of the CWA. (Compl. ¶¶ 42–43, 55, ECF No. 1.) Acknowledging that DENR's state enforcement action includes a claim for engineered seeps, the Riverkeepers expressly limit their Seep Claim to discharges through non-engineered seeps and the unpermitted pipe. (Id. ¶¶ 12, 56.) The Riverkeepers' Complaint alleges that discharges through the non-engineered seeps "emerge" from the coal ash lagoons into a "tributary of the Yadkin River" and an "inlet that then flows into the Yadkin River," while discharges from the unpermitted pipe flow directly into the Yadkin River. (Id. ¶ 42.)

---

[4] Duke Energy refers to this claim as the "Groundwater claim." (Def.'s Dismissal Mem. 6, ECF No. 23.) Because more than one claim relates to groundwater, the Court refers to the claim as the "Hydrological Connection Claim."

<u>Hydrological Connection Claim</u>:  The Riverkeepers further claim that pollutants from the coal ash lagoons have entered the groundwater at Buck, which is hydrologically connected to the Yadkin River, High Rock Lake, and their tributaries.  (<u>Id.</u> ¶¶ 45, 67.)  The hydrologically connected groundwater then carries the pollutants into these surface waters.  (<u>See</u> <u>id.</u> ¶¶ 48, 67.)  The Riverkeepers claim that the "[u]npermitted discharges of pollutants via hydrologically connected groundwater to surface waters of the United States violate the Clean Water Act."  (<u>Id.</u> ¶ 68; <u>see</u> <u>id.</u> ¶ 70.)

<u>Removed Substances Claim</u>:  The Riverkeepers next allege that Duke Energy has violated a provision of the Buck Permit that requires substances "removed in the course of treatment or control of wastewaters" to be "utilized/disposed of . . . in a manner such as to prevent any pollutant from such materials from entering waters of the State or navigable waters of the United States except as permitted by the Commission," (Buck Permit § II.C.6, ECF No. 30-9).  The Riverkeepers allege that coal ash pollutants have been found in the groundwater at Buck and have been entering the Yadkin River, High Rock Lake, and their tributaries via seeps and streams.  (Compl. ¶¶ 61–62, ECF No. 1.)  They thus allege that Duke has violated the Buck Permit and the CWA by "allowing and causing" removed substances to enter waters of the state and the United States.  (<u>Id.</u> ¶ 65.)

<u>Dam Safety Claim</u>:  Finally, the Riverkeepers claim that Duke Energy has violated a provision of the Buck Permit that requires the facility to "meet the dam design and dam safety requirements" set out in state regulations, (Buck Permit § I.A.19, ECF No. 30-9).  The Riverkeepers allege that the dams at Buck fail to meet dam safety requirements that prohibit unsafe seepage, prohibit leaking pipe conduits, require stable design and construction, and require conformance to good engineering practice.  (Compl. ¶¶ 72–76, ECF No. 1.)  The

6

Riverkeepers claim that these "numerous failings at the dams" violate the Buck Permit and the CWA. (Id. ¶ 49; see id. ¶ 72.)

**E. Legislative & Regulatory Developments**

Since the Riverkeepers filed this lawsuit, legislative and regulatory developments have occurred that impact Duke Energy's management of its coal ash lagoons.

*1. Coal Ash Management Act of 2014*

On September 20, 2014, the North Carolina General Assembly enacted the Coal Ash Management Act of 2014 ("CAMA"), N.C. Gen. Stat. §§ 130A-309.200–.231 (2015). CAMA requires Duke Energy, as a public utility owner of coal ash lagoons in North Carolina,[5] to take corrective action to restore groundwater quality, identify and address unpermitted discharges at its lagoons, and eventually close all lagoons by the year 2029. Id. §§ 130A-309.211–.212, .214. At each step of the process, CAMA directs Duke Energy to develop plans for DENR's review and to implement those plans. Id. For the closure process, CAMA creates an additional level of review by establishing the Coal Ash Management Commission ("Commission") to oversee the process. Id. § 130A-309.202(a). The Commission has two primary responsibilities. First, it must approve risk classifications that DENR develops for each lagoon. Id. § 130A-309.213(c). High-risk lagoons must be closed by the end of 2019, intermediate-risk lagoons by the end of 2024, and low-risk lagoons by the end of 2029. Id. § 130A-309.214(a)(1)–(3). Second, it must approve closure plans that Duke Energy submits for each lagoon following the classification process. Id. § 130A-309.214(d). If DENR fails to act within a certain amount of time, DENR's classifications

---

[5] CAMA applies to owners of "coal combustion residuals surface impoundment[s]." See N.C. Gen. Stat. §§ 130A-309.211–.212, .214. These surface impoundments include "[l]agoons . . . designed to hold accumulated coal combustion residuals." Id. § 130A-309.201(6)(c). Because the parties refer to coal ash "lagoons," rather than coal ash "surface impoundments," the Court will do likewise.

and Duke Energy's closure plans are deemed approved.  Id. §§ 130A-309.213(c), 130A-309.214(d).

### 2. Coal Ash Disposal Rule

On December 19, 2014, the EPA announced the Disposal of Coal Combustion Residuals from Electric Utilities final rule ("Coal Ash Disposal Rule"), 80 Fed. Reg. 21,302 (Apr. 17, 2015) (to be codified at 40 C.F.R. pts. 257, 261).  The Coal Ash Disposal Rule "establishes nationally applicable minimum criteria for the safe disposal of coal combustion residuals in landfills and surface impoundments." Id. at 21,303.  It applies to Duke Energy, as an owner and operator of "existing surface impoundments," including coal ash lagoons that no longer receive coal ash but still contain coal ash and liquids.  See id.  The minimum criteria include "location restrictions, liner design criteria, structural integrity requirements, operating criteria, groundwater monitoring and corrective action requirements, closure and post-closure care requirements, and recordkeeping, notification, and internet posting requirements." Id. at 21,304.

## II.    MOTION TO DISMISS

Duke Energy moves to dismiss each of the Riverkeepers' claims for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, or failure to state a claim, pursuant to rule 12(b)(6).

### A.  Standard of Review

#### 1. Rule 12(b)(1): Lack of Subject-Matter Jurisdiction

Subject-matter jurisdiction relates to the court's power to hear a case.  Holloway v. Pagan River Dockside Seafood, Inc., 669 F.3d 448, 453 (4th Cir. 2012) (citing Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006)).  A motion under Rule 12(b)(1), which governs

dismissal for lack of subject-matter jurisdiction, raises the question of "whether [the plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [the] claim." Id. at 452. The burden of establishing subject-matter jurisdiction is on the plaintiff. Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). When evaluating a Rule 12(b)(1) motion to dismiss, the court may consider evidence outside the pleadings and should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (quoting Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991)). Once the court determines it lacks subject-matter jurisdiction over a claim, it must dismiss that claim. See Jones v. Calvert Grp., Ltd., 551 F.3d 297, 301 (4th Cir. 2009). Irrespective of whether the parties raise the issue of subject-matter jurisdiction, the court has an independent obligation to ensure that it possesses jurisdiction before proceeding. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 480 (4th Cir. 2005).

>    *2. Rule 12(b)(6): Failure to State a Claim*

A motion to dismiss under Rule 12(b)(6) "challenges the legal sufficiency of a complaint," including whether it meets the pleading standard of Rule 8(a)(2). Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009). Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible

when the complaint alleges facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

## B. Unpermitted Discharge Claims

Duke Energy argues that the Seep Claim and Hydrological Connection Claim are barred by DENR's diligent prosecution in state court.[6] The CWA's citizen suit provision authorizes any citizen to commence a civil action against any person alleged to be in violation of "an effluent standard or limitation" under the CWA or "an order . . . with respect to such a standard or limitation." 33 U.S.C. § 1365(a)(1). The same provision prohibits citizens from filing suit when the EPA or state "has commenced and is diligently prosecuting" a judicial action "to require compliance with the standard, limitation, or order." Id. § 1365(b)(1)(B). Whether the diligent prosecution bar is a jurisdictional issue remains an open question. The Fifth Circuit has concluded that the bar is not jurisdictional. La. Envtl. Action Network v. City of Baton Rouge, 677 F.3d 737, 749 (5th Cir. 2012). The Fourth Circuit has not directly addressed the issue, though it has affirmed a district court's evaluation of the diligent prosecution bar under Rule 12(b)(1). See Piney Run, 523 F.3d at 459–61. It has also described the bar as "an exception to the jurisdiction granted" in § 1365(a). Id. at 456 (quoting Chesapeake Bay Found. v. Am. Recovery Co., 769 F.2d 207, 208 (4th Cir. 1985)). The Court will evaluate Duke Energy's diligent prosecution argument

---

[6] Duke Energy's diligent prosecution argument encompasses the Seep Claim and what it refers to as the "Groundwater claims." (See Def.'s Dismissal Mem. 8–14, ECF No. 23.) At oral argument, it clarified that the "Groundwater claims" include both the Hydrological Connection Claim and the Removed Substances Claim. (Hr'g Tr. 22:23–23:5, ECF No. 44.) The Court addresses Duke Energy's diligent prosecution argument as it relates to the Seep Claim and Hydrological Connection Claim together because both claims seek to abate the unpermitted discharge of pollutants into protected waters. Because the Removed Substances Claim seeks to enforce a provision of the Buck Permit, rather than to abate the unpermitted discharge of pollutants, the Court addresses that claim separately.

under Rule 12(b)(1) for lack of subject-matter jurisdiction.

For an agency lawsuit to bar a citizen suit based on diligent prosecution, the agency suit must seek to enforce the same standard, limitation, or order as the citizen suit. Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc., 728 F.3d 868, 874 (9th Cir. 2013) ("Subsection (b)'s reference to 'the' clean-water standard makes clear that it must be the same standard, limitation, or order that is the subject of the citizen suit under subsection (a)."). Thus, the first question in a diligent prosecution inquiry is whether, at the time the citizen suit was filed, the EPA or state had commenced a judicial action to enforce the same standard, limitation, or order as the citizen suit. Conn. Fund for the Env't v. Contract Plating Co., 631 F. Supp. 1291, 1293 (D. Conn. 1986). If so, the next question is whether the EPA or state was "diligently prosecuting" its enforcement action at the time the citizen suit was filed. Id.

To determine whether an agency enforcement action and citizen suit seek to enforce the same standards, limitations, or orders, "the court may rely primarily on a comparison of the pleadings filed in the two actions." Id.; see Sierra Club v. City & Cty. of Honolulu, No. 04-00463 DAE-BMK, 2008 WL 1968317, at *5 (D. Haw. May 7, 2008) (comparing the complaints filed in the agency suit and the citizen suit). The comparison need not reveal identical claims for the actions to cover the same standards and limitations. Citizen suits seeking to enforce the same standards and limitations as an agency suit have been barred even when they alleged violations occurring at more locations and at different times than those alleged in the agency suit. See, e.g., Karr v. Hefner, 475 F.3d 1192, 1199 (10th Cir. 2007) (rejecting the plaintiffs' argument that an EPA enforcement action was not diligent because it addressed violations at only 19 to 21 of the 37 well locations listed in the

11

plaintiffs' complaint); <u>Sierra Club</u>, 2008 WL 1968317, at *5 (concluding two suits covered the same standard or limitation even though the citizen suit alleged violations occurring seven years after those covered in the agency suit). Citizen suits have also been barred when seeking to enforce specific permit conditions that fall within the scope of a broader agency enforcement action. <u>See, e.g.</u>, <u>Cmty. of Cambridge Envtl. Health & Cmty. Dev. Grp. v. City of Cambridge</u>, 115 F. Supp. 2d 550, 556 (D. Md. 2000) (finding that an agency suit addressing all sewage overflows covered the same issues as a citizen suit alleging sewage overflows during dry weather, in violation of a NPDES permit provision specifically prohibiting "discharges during dry weather"). The diligent prosecution bar does not apply, however, if the agency suit and citizen suit seek to enforce different standards and limitations of the same NPDES permit. <u>See</u> <u>Frilling v. Vill. of Anna</u>, 924 F. Supp. 821, 837–38 (S.D. Ohio 1996) (concluding that an agency enforcement of two NPDES permit parameters "does *not* prevent Plaintiffs from seeking to enforce [four different parameters] through a citizen suit"); <u>cf.</u> <u>Md. Waste Coal. v. SCM Corp.</u>, 616 F. Supp. 1474, 1483 (D. Md. 1985) (explaining, in the Clean Air Act context, that "[i]n a situation where a single emission source violates multiple standards, limitations or orders, it would defeat the purpose of the citizen suit provision to hold that EPA's enforcement of a single standard against the emission source would bar private enforcement of other standards, limitations or orders applicable to the same emission source").

Here, a comparison of the complaints in this action and DENR's state enforcement action reveals overlapping standards and limitations on both the Seep Claim and the Hydrological Connection Claim. In their claims, the Riverkeepers allege that Duke Energy has made unpermitted discharges of pollutants through non-engineered seeps, a pipe, and

12

hydrologically connected groundwater, in violation of the CWA's general prohibition on the unpermitted discharge of pollutants from a point source into the navigable waters of the United States, 33 U.S.C. § 1311(a). (See Compl. ¶¶ 54–56, 67–70, ECF No. 1.) DENR, in its state court action, similarly seeks to abate unpermitted seeps and discharges at Buck. (See DENR's Compl. ¶¶ 78–81, 192, ECF No. 20-2.) The Riverkeepers point out that DENR's complaint identifies only one type of seep, engineered seeps, and insist that "this allusion to engineered seeps cannot go so far as to cover the pervasive non-engineered seeps at Buck." (Pls.' Dismissal Opp'n 16, ECF No. 30.) Even though DENR identifies fewer unpermitted discharges than the Riverkeepers, the fact remains that both DENR and the Riverkeepers seek to abate the unpermitted discharge of pollutants into protected waters. See Sierra Club, 2008 WL 1968317, at *5 ("Separate violations of the same standard or limitation . . . is inadequate to establish that [the agency suit] and the citizen suit do not cover the same standard or limitation."). The Court thus finds that the Riverkeepers' Seep Claim and Hydrological Connection Claim seek to enforce the same standard or limitation as DENR's unpermitted seeps claim.

Proceeding next to the question of diligence, "[a] CWA enforcement prosecution will ordinarily be considered 'diligent' if the judicial action 'is capable of requiring compliance with the Act and is in good faith calculated to do so.'" Piney Run, 523 F.3d at 459 (quoting Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist., 382 F.3d 743, 760 (7th Cir. 2004)). "[D]iligence is presumed." Id. To overcome this presumption, the citizen-plaintiff can demonstrate "a pattern of conduct in [the state's] prosecution of the defendant that could be considered dilatory, collusive or otherwise in bad faith." Connecticut Fund, 631 F. Supp. at 1293. It is insufficient to merely show "that the agency's prosecution

strategy is less aggressive than [the citizen-plaintiff] would like," Piney Run, 523 F.3d at 459, as the diligent prosecution bar "does not require government prosecution to be far-reaching or zealous," id. (quoting Karr, 475 F.3d at 1197).  The standard for citizen-plaintiffs to overcome the presumption of diligence is high.  Id. (quoting Karr, 475 F.3d at 1198).  The deference courts owe to the agency prosecution, however, is not unlimited.  Ohio Valley Envtl. Coal., Inc. v. Maple Coal Co., 808 F. Supp. 2d 868, 884 (S.D. W. Va. 2011).  "[A] diligent prosecution analysis requires more than mere acceptance at face value of the potentially self-serving statements of a state agency and the violator."  Id. (alteration in original) (quoting Friends of Milwaukee's Rivers, 382 F.3d at 760).  It requires that the agency "try, diligently," to achieve compliance.  Id. (quoting Friends of Milwaukee's Rivers, 382 F.3d at 759).

In evaluating diligence, "the court may rely primarily on objective evidence from the court files with respect to the status of the state's suit at the time that the citizens' suit was commenced and the prospects that the state suit would proceed expeditiously to a final resolution."  Connecticut Fund, 631 F. Supp. at 1293.  Congress also envisioned that courts would consider citizen suits "against the background of the agency action" to assess the adequacy of the agency action.  S. Rep. No. 92-414, at 80 (1971), as reprinted in 1972 U.S.C.C.A.N. 3668, 3746.

The Riverkeepers contend "[t]here is a concerted effort by [DENR] and the Defendant to effectively stop continued citizen law enforcement and, in fact, any judicial law

enforcement against the coal ash issues."[7]  (Hr'g Tr. 33:14–17, ECF No. 44.)  In this case,

DENR filed its enforcement action in state court on August 16, 2013.  (DENR's Compl.,

ECF No. 20-2.)  When the Riverkeepers filed their citizen suit on September 3, 2014,

DENR's state enforcement action had been pending for over one year.  In that time, based

on a review of the state court docket sheet,[8] DENR appears to have done little, if anything,

to move the case forward.  It had not taken depositions, it had not filed motions, and an

initial case management order was not yet in place, one year into litigation.  (See Hr'g Tr.

33:23–34:1, ECF No. 44; Initial Case Mgmt. Order, ECF No. 41-2 (signed September 9,

2014).)  At the time the Riverkeepers filed this action, there appeared little likelihood that

DENR's action would proceed expeditiously to a final resolution.  See Ohio Valley Envtl.

Coal. Inc. v. Hobet Mining, LLC, No. 3:08-0088, 2008 WL 5377799, at *5–6 (S.D. W. Va.

---

[7] The Riverkeepers assert the following as background to DENR's state enforcement action:  In 2013, DENR filed several enforcement actions in state court, encompassing each of Duke Energy's fourteen coal ash facilities in North Carolina, including the Buck facility, in an alleged effort to preempt citizen groups from initiating their own suits in federal court.  (Hr'g Tr. 29:24–30:3, ECF No. 44; see DENR's Letter 2, ECF No. 20-7.)  The citizen groups then spent six months fighting Duke Energy's efforts to prevent them from intervening in DENR's state court suit and to dismiss their citizen suits in federal court.  (Hr'g Tr. 30:12–18, ECF No. 44.)  While the parties were entangled in procedural activity, nothing was done to address the coal ash issues.  (Id. at 30:19–20, 31:5–7.)  In February 2014, a stormwater pipe burst beneath a coal ash impoundment at Duke Energy's Dan River facility.  Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc., 25 F. Supp. 3d 798, 803 n.7 (E.D.N.C. 2014).  "The coal ash flowed into the river for days, and leaked tens of thousands of tons of coal ash and tens of millions of gallons of contaminated water, which polluted the river for at least 70 miles through North Carolina and Virginia."  Id.  The Dan River spill prompted the United States Attorney's Office to initiate an investigation of Duke Energy and DENR.  (See Def.'s Stay Mem. 14, ECF No. 24.)  Against this background, the Riverkeepers contend that citizens "can't always count on the government to do the right thing" and that Congress provided citizens with the right to enforce the law when the government has failed to do so.  (Hr'g Tr. 32: 13–19, ECF No. 44.)

[8] The Court takes judicial notice of the docket sheet in DENR's state enforcement action, which is Case No. 13-CVS-14661 in the General Court of Justice, Superior Court Division, in Mecklenburg County.  See Witthohn v. Fed. Ins. Co., 164 F. App'x 395, 397 (4th Cir. 2006) (per curiam) (stating that a district court "may clearly take judicial notice" of public records, including state court records).

Dec. 18, 2008) (finding a lack of diligence where, at the time the plaintiffs filed their citizen suit, "the state court action had been dormant for over a year" and "[t]he *only* actions [the agency] had taken . . . were to file amendments to its complaint"). The Court is unable to find that DENR was trying diligently or that its state enforcement action was calculated, in good faith, to require compliance with the Act. Accordingly, DENR's state enforcement action does not bar the Riverkeepers from pursuing their Seep Claim and Hydrological Connection Claim in this citizen suit.

In addition, the Court notes that its determination of DENR's lack of diligence has been further confirmed in the year since the Riverkeepers filed suit. DENR has now been litigating its enforcement action for over two years. At oral argument, the Riverkeepers informed the Court that DENR had not taken any depositions in that time or filed any motions requiring Duke Energy to clean up its sites. (Hr'g Tr. 33:23–34:1, ECF No. 44.) To the contrary, the Riverkeepers stated that DENR and Duke Energy have entered into an agreement to stay discovery of Duke Energy in the state proceeding. (Id. at 34:5–9.) Further, as the parties informed the Court and as confirmed by the state court docket sheet, DENR has now moved to stay its own enforcement action. (Pls.' Notice of Suppl. Evid. 1, ECF No. 46; see DENR's Mot. to Stay., ECF No. 46-1.)

## C. Hydrological Connection Claim

As an alternative to its diligent prosecution argument, Duke Energy presents an additional argument for dismissing the Hydrological Connection Claim, through which the Riverkeepers seek to abate the unpermitted discharge of pollutants to navigable surface waters via hydrologically connected groundwater. Pointing out that the CWA prohibits

discharges of pollutants only when the pollutant originates from a "point source,"[9] Duke Energy argues that neither the coal ash lagoons nor the groundwater beneath the lagoons fall within the definition of a "point source." (Def.'s Dismissal Mem. 16–18, ECF No. 23.) It further argues that the CWA does not regulate the discharge of pollutants into the groundwater. (Def.'s Dismissal Reply 4–6, ECF No. 31.) Based on these assertions, Duke Energy contends the Court lacks subject-matter jurisdiction over the Hydrological Connection Claim and must dismiss the claim pursuant to Rule 12(b)(1). The Riverkeepers do not appear to dispute Duke Energy's arguments that groundwater is not a point source or that the CWA does not regulate the discharge of pollutants into groundwater.[10] They do, however, argue that the Court has jurisdiction over the Hydrological Connection Claim based on their contention that the coal ash lagoons are point sources and that the groundwater beneath the lagoons serves as a conduit between the point source lagoons and the Yadkin River and High Rock Lake, which are protected navigable waters under the CWA. (See Pls.' Dismissal Opp'n. 17–24, ECF No. 30.)

The Court first considers whether coal ash lagoons are point sources, as the Riverkeepers argue. The CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit,

_____

[9] The CWA generally prohibits "the discharge of any pollutant by any person," except as in compliance with the CWA. 33 U.S.C. § 1311(a). It then defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source." Id. § 1362(12)(A).

[10] The Riverkeepers clarify that they "do not contend that the groundwater flowing beneath and around the Buck plant is itself subject to regulation." (Pls.' Dismissal Opp'n 23, ECF No. 30.) Rather, they argue that the CWA applies when the groundwater serves as a conduit for pollutant discharges to protected navigable waters. (Id.) Their claim is similar to a claim in Hawai'i Wildlife Fund v. County of Maui, where the court explained, "Plaintiffs do not appear to be arguing that the groundwater requires protection for its own independent ecological value. Instead, the concern is that the County should not be allowed to pollute the ocean *through* that groundwater." 24 F. Supp. 3d 980, 997 (D. Haw. 2014).

well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). The coal ash lagoons at Buck are surface impoundments designed to hold accumulated coal ash in the form of liquid waste. (See Compl. ¶¶ 32, 51, ECF No. 1; Hr'g Tr. 20:7–10, ECF No. 44). They are impounded by dams towering above the Yadkin River. (Compl. ¶ 32, ECF No. 1.) As such, the coal ash lagoons appear to be confined and discrete. Because the lagoons are allegedly unlined and leaking pollutants into the groundwater, (id. ¶ 52), they are also allegedly conveying pollutants to navigable waters. As confined and discrete conveyances, the lagoons fall within the CWA's definition of "point source." See Umatilla Waterquality Protective Ass'n, Inc. v. Smith Frozen Foods, Inc., 962 F. Supp. 1312, 1321 (D. Or. 1997) (describing an unlined brine pond, in dicta, as "a confined and discrete conveyance within the CWA's definition of 'point source'"); see also United States v. Alpha Nat. Res., Inc., No. 2:14-11609, 2014 WL 6686690, at *1 (S.D. W. Va. Nov. 26, 2014) (noting that "impoudments and settlement ponds" at a coal mining operation qualify as "point sources"). This conclusion is consistent with the broad interpretation courts have given to the term "point source." See Dague v. City of Burlington, 935 F.2d 1343, 1354 (2d Cir. 1991) ("The definition of a point source is to be broadly interpreted . . . ."), rev'd in part on other grounds, 505 U.S. 557 (1992); United States v. Earth Scis., Inc., 599 F.2d 368, 373 (10th Cir. 1979) ("The concept of a point source was designed to further [the CWA] scheme by embracing the broadest possible definition of any identifiable conveyance from which pollutants might enter the waters of the United States."); Ohio Valley Envtl. Coal., Inc. v. Hernshaw Partners, LLC, 984 F. Supp. 2d 589, 598 (S.D.

W. Va. 2013) ("[T]he definition of a 'point source' is intended to be interpreted broadly, as indicated by the statute's 'including but not limited to' language.").

The Court next addresses whether it has jurisdiction under the CWA to consider a claim, as asserted by the Riverkeepers, where pollutants travel from a point source to navigable waters through hydrologically connected groundwater. Courts are divided on the issue. Several courts have affirmed CWA jurisdiction. See, e.g., Hawai'i Wildlife Fund v. Cty. of Maui, 24 F. Supp. 3d 980, 995 (D. Haw. 2014) (inferring "that Congress sought to include sufficiently 'confined and discrete' groundwater conduits as 'point sources' under the Act"); Nw. Envtl. Def. Ctr. v. Grabhorn, Inc., No. CV-08-548-ST, 2009 WL 3672895, at *11 (D. Or. Oct. 30, 2009) (concluding, in light of the EPA's regulatory pronouncements, that "the CWA covers discharges to navigable surface waters via hydrologically connected groundwater"); Hernandez v. Esso Standard Oil Co. (P.R.), 599 F. Supp. 2d 175, 181 (D.P.R. 2009) (holding that "the CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States"); Idaho Rural Council v. Bosma, 143 F. Supp. 2d 1169, 1180 (D. Idaho 2001) (finding that "the CWA extends federal jurisdiction over groundwater that is hydrologically connected to surface waters that are themselves waters of the United States"); Williams Pipe Line Co. v. Bayer Corp., 964 F. Supp. 1300, 1319 (S.D. Iowa 1997) (observing that "[t]he majority of courts have held that groundwaters that are hydrologically connected to surface waters are regulated waters of the United States, and that unpermitted discharges into such groundwaters are prohibited under section 1311"); Wash. Wilderness Coal. v. Hecla Mining Co., 870 F. Supp. 983, 990 (E.D. Wash. 1994) (reasoning that "since the goal of the CWA is

19

to protect the quality of surface waters, any pollutant which enters such waters, whether directly or through groundwater, is subject to regulation by NPDES permit").

Other courts have rejected CWA jurisdiction. See, e.g., Tri-Realty Co. v. Ursinus Coll., --- F. Supp. 3d ---, 2015 WL 5013729, at *27 (E.D. Pa. 2015) (explaining that the "discharge of pollutants into navigable waters occurring only through migration of groundwater and uncontrolled soil runoff" is beyond the scope of the CWA because it represents "nonpoint source" pollution); Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc., 25 F. Supp. 3d 798, 810 (E.D.N.C. 2014) (holding that "Congress did not intend for the CWA to extend federal regulatory authority over groundwater, regardless of whether that groundwater is eventually or somehow 'hydrologically connected' to navigable surface waters"); Umatilla, 962 F. Supp. at 1320 (holding that "discharges of pollutants into groundwater are not subject to the CWA's NPDES permit requirement even if that groundwater is hydrologically connected to surface water").

This Court agrees with the line of cases affirming CWA jurisdiction over the discharge of pollutants to navigable surface waters via hydrologically connected groundwater, which serves as a conduit between the point source and the navigable waters. Recognizing that the goal of the CWA is to protect the quality of the nation's waters, one court explains, simply and persuasively,

> [I]t would hardly make sense for the CWA to encompass a polluter who discharges pollutants via a pipe running from the factory directly to the riverbank, but not a polluter who dumps the same pollutants into a man-made settling basin some distance short of the river and then allows the pollutants to seep into the river via the groundwater.

N. Cal. River Watch v. Mercer Fraser Co., No. C-04-4620 SC, 2005 WL 2122052, at *2 (N.D. Cal. Sept. 1, 2005). This view is also consistent with the EPA's regulatory

pronouncements. The EPA stated in 1991, "[T]he Act requires NPDES permits for discharges to groundwater where there is a direct hydrological connection between groundwaters and surface waters." 56 Fed. Reg. 64,876, 64,892 (Dec. 12, 1991). It explained, "In these situations, the affected groundwaters are not considered 'waters of the United States' but discharges to them are regulated because such discharges are effectively discharges to the directly connected surface waters." Id. In 2001, discussing a rule to take effect in 2003, the EPA "restat[ed] that [it] interprets the Clean Water Act to apply to discharges of pollutants from a point source via ground water that has a direct hydrologic connection to surface water." 66 Fed. Reg. 2960, 3015 (proposed Jan. 12, 2001). Later discussing the 2003 rule, the EPA clarified that it had "stated that nothing in the 2003 rule was to be construed to expand, diminish, or otherwise affect the jurisdiction of the CWA over discharges to surface water via groundwater that has a direct hydrologic connection to surface water." 73 Fed. Reg. 70,418, 70,420 (Nov. 20, 2008).

Courts that have declined to exercise jurisdiction over hydrologically connected groundwater claims have typically done so "under the theory that the groundwater is not *itself* 'water of the United States.'" Hawai'i Wildlife Fund, 24 F. Supp. 3d at 996 (pondering that the split in authority "may largely flow from a lack of clarity by courts as to whether they are determining that groundwater itself may or may not be regulated under the Clean Water Act or are determining that groundwater may or may not be regulated when it serves as a conduit to water that is indeed regulated"); see, e.g., Cape Fear River Watch, 25 F. Supp. 3d at 810; Umatilla, 962 F. Supp. at 1320. This Court views the issue not as whether the CWA regulates the discharge of pollutants into groundwater itself but rather whether the CWA regulates the discharge of pollutants to navigable waters via groundwater. Thus, the

Court concludes that it has jurisdiction under the CWA to adjudicate claims where, as alleged in this case, pollutants travel from a point source to navigable waters through hydrologically connected groundwater serving as a conduit between the point source and the navigable waters. Accordingly, the Court denies Duke Energy's request to dismiss the Riverkeepers' Hydrological Connection Claim pursuant to Rule 12(b)(1).

## D. Removed Substances Claim

Duke Energy next seeks to dismiss the Riverkeepers' Removed Substances Claim, on two grounds: (1) that the claim is barred by DENR's diligent prosecution, pursuant to Rule 12(b)(1), and (2) that the Riverkeepers have failed to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6).

In its diligent prosecution argument, Duke Energy begins by characterizing the Riverkeepers' Removed Substances Claim as a "groundwater claim"[11] and pointing out that DENR's state enforcement action includes a claim alleging that Duke Energy has exceeded state groundwater quality standards, in violation of state groundwater regulations. (See Def.'s Dismissal Mem. 11–12, ECF No. 23.) Duke Energy argues, "[T]he enforcement action filed by DENR seeks to address and remediate groundwater pollution caused by any discharges from the coal ash basins at Buck. It thus plainly encompasses the claims brought in this case." (Id. at 12.)

Duke Energy's diligent prosecution argument fails at the first step of the inquiry, as DENR has not sought to require compliance with the same standard or limitation as the Riverkeepers. In the Removed Substances Claim, the Riverkeepers seek to enforce the

---

[11] Duke Energy refers to the Hydrological Connection Claim and the Removed Substances Claim collectively as "Groundwater claims." (See Def.'s Dismissal Mem. 11–12, ECF No. 23; Hr'g Tr. 22:23–23:5, ECF No. 44.) The Court addresses the two claims separately. See infra n.6.

removed substances provision of the Buck Permit, which provides, in relevant part, "Solids, sludges, filter backwash, or other pollutants removed in the course of treatment or control of wastewaters shall be utilized/disposed of . . . in a manner such as to prevent any pollutant from such materials from entering waters of the State or navigable waters of the United States except as permitted by the Commission." (Buck Permit § II.C.6, ECF No. 30-9.) This provision of the Buck Permit is distinct from the state groundwater regulations DENR seeks to enforce in state court. While the state groundwater regulations aim to ensure the quality of groundwater, the removed substances provision aims to ensure the integrity of wastewater treatment and control systems. As the Riverkeepers explain, "If you have a wastewater treatment plant, it can't leak." (Hr'g Tr. 40:9–10, ECF No. 44.) To interpret the removed substances provision as a requirement that Duke Energy comply with groundwater quality standards would be to misread the removed substances provision of the Buck Permit, which does not mention groundwater.

Moreover, DENR's prosecution of its groundwater claim is not aimed at requiring Duke Energy to comply with the removed substances provision. State groundwater regulations require Duke Energy to comply with groundwater quality standards only beyond the compliance boundary at Buck, which is either "500 feet from the waste boundary or at the property boundary, whichever is closer to the source." 15A N.C. Admin. Code 2L.0107(a) (2015). Removing pollutants from groundwater hundreds of feet away from the coal ash lagoons, which is the aim of DENR's claim, is not the same as stopping the lagoons from leaking pollutants into the groundwater, which is the aim of the Riverkeepers' claim. Accordingly, the diligent prosecution bar does not apply to the Riverkeepers' Removed Substances Claim.

Duke Energy alternatively seeks to dismiss the Removed Substances Claim pursuant to Rule 12(b)(6) for failure to state a claim. (See Hr'g Tr. 23:13–15, ECF No. 44.) The removed substances provision applies to substances "removed in the course of treatment" and "utilized/disposed of" in a manner that violates the removed substances provision. (See Buck Permit § II.C.6, ECF No. 30-9.) Duke Energy contends the Riverkeepers have failed to allege that anything was "removed" or "utilized/disposed of." (See Def.'s Dismissal Mem. 21, ECF No. 23.) The Court disagrees.

In the Complaint, the Riverkeepers describe the coal ash lagoons as a "wastewater treatment system" designed to "treat and remove solids, sludges, substances, materials, and pollutants." (Compl. ¶ 63, ECF No. 1.) When the coal-fired generating plants were in operation, various streams of waste would travel to the lagoons, where they would be treated through the settling process. (Id. ¶ 59; see id. ¶ 14.) The Riverkeepers describe the coal ash contaminants that settle to the bottom of the lagoons as having been "removed in the course of treatment." (See id. ¶ 60.) Although Duke Energy insists that nothing is physically removed from the coal ash lagoons, (Hr'g Tr. 20:10–11, ECF No. 44), the removed substances provision does not require anything to be removed from the lagoons themselves. Rather, it applies to substances "removed in the course of treatment or control of wastewaters." (Buck Permit § II.C.6, ECF No. 30-9.) The Court finds it plausible for the Riverkeepers to characterize substances that have settled to the bottom of the lagoons as having been removed in the course of treatment. Also plausible is the Riverkeepers' allegation that Duke Energy used the coal ash lagoons to dispose of coal ash and other wastes. (See Compl. ¶ 31, ECF No. 1.) The Riverkeepers further allege that coal ash pollutants have been found in the groundwater at Buck and have been entering state waters

24

and navigable waters of the United States. (Id. ¶¶ 61–62.) Taken as true, these factual allegations allow the Court to draw the reasonable inference that substances removed in the course of wastewater treatment at Buck have been disposed of in a manner that has allowed pollutants to enter protected waters. The Riverkeepers have thus stated a claim upon which relief can be granted, and dismissal is not warranted under Rule 12(b)(6).[12]

### E. Dam Safety Claim

Lastly, Duke Energy moves to dismiss the Riverkeepers' Dam Safety Claim for lack of standing. The Court evaluates this claim for lack of subject-matter jurisdiction under Rule 12(b)(1). See Greenville Cty. Republican Party Exec. Comm. v. Greenville Cty. Election Comm'n, 604 F. App'x 244, 250 n.12 (4th Cir. 2015) (per curiam) ("[D]ismissal of a claim for lack of standing to sue is typically sought by way of Rule 12(b)(1) . . . .").

The Buck Permit includes a provision requiring the facility to "meet the dam design and dam safety requirements" set out in state regulations. (Buck Permit § I.A.19, ECF No. 30-9 (requiring compliance with 15A N.C. Admin. Code subch. 2K).) The Riverkeepers

---

[12] Duke Energy makes a few additional arguments related to the Removed Substances Claim. According to Duke Energy, the Riverkeepers interpret the removed substances provision to prohibit the discharge of any pollutants removed in the course of wastewater treatment, meaning Duke Energy would violate the removed substances provision with every pollutant discharge, including those expressly authorized by the permit. (Def.'s Dismissal Mem. 19, ECF No. 23.) That is not the case. The removed substances provision includes an express limit on its own reach: it applies only "except as permitted by the Commission." (Buck Permit § II.C.6, ECF No. 30-9.) By its own terms, the provision cannot be violated by a discharge made in compliance with the permit. Duke Energy also argues that the Riverkeepers' claim contradicts state groundwater standards. (Def.'s Dismissal Mem. 20, ECF No. 23.) That is also not the case, as state groundwater standards apply only to groundwater beyond Buck's compliance boundary, hundreds of feet away from the lagoons. See 15A N.C. Admin. Code 2L.0107(a) (2015). The removed substances provision, on the other hand, applies within the compliance boundary, where the lagoons are located. Finally, Duke Energy seeks to dismiss the claim because DENR knew of Duke Energy's discharges but has never suggested these discharges violate the removed substances provision. (Def.'s Dismissal Mem. 20–21, ECF No. 23.) The Court finds this argument unpersuasive. Even if DENR has acquiesced to any violations of the removed substances provision, that would not mean Duke Energy is necessarily in compliance with the provision.

claim Duke Energy has violated this provision of the Buck Permit by failing to meet the dam safety requirements of state regulations. (Compl. ¶ 72, ECF No. 1.) In seeking to dismiss this claim, Duke Energy argues that "state regulations unconnected with any sort of discharge" are beyond the reach of the CWA. (Def.'s Dismissal Mem. 22, ECF No. 23.) Duke Energy also contends the citizen suit provision's definition of "effluent standard or limitation" does not encompass state dam safety regulations, depriving the Riverkeepers of standing to enforce them. (Id. at 23.)

As discussed above, the CWA authorizes citizens to enforce conditions of NPDES permits. See 33 U.S.C. § 1365(a); id. § 1365(f)(6) (defining "effluent standard or limitation" to include a NPDES permit or condition thereof). The dam safety provision of the Buck Permit is a condition of a NPDES permit. See id. § 1365(f)(6). It is thus enforceable through a citizen suit, and the Riverkeepers have standing to enforce it. Moreover, dam safety requirements are consistent with the EPA's requirement for all NPDES permit holders to "properly operate and maintain all facilities and systems of treatment and control . . . which are installed or used by the permittee to achieve compliance with the conditions of [their] permit," 40 C.F.R. § 122.41(e) (setting conditions applicable to all NPDES permits). If the dams at Buck serve to contain the contents of the coal ash lagoons, as the Riverkeepers allege, (see Compl. ¶ 32, ECF No. 1), then dam failure could result in a "catastrophic release of waste" from the lagoons into the Yadkin River. See 80 Fed. Reg. at 21,325 (referencing dam failures in Pennsylvania and Tennessee). While the dam safety provision of the Buck Permit does not itself regulate the discharge of pollutants, dam safety is vital to Duke Energy's efforts to prevent unlawful discharge and comply with the conditions of its permit.

Additionally, a permit condition need not address the discharge of pollutants to be enforceable through a citizen suit. See Nw. Envtl. Advocates v. City of Portland, 56 F.3d 979, 988 (9th Cir. 1995) ("[S]everal courts have held that citizens groups may seek to enforce many kinds of permit conditions besides effluent limitations."). Nor does it need to be a requirement of the CWA itself. As one district court has observed, "it is clear the Clean Water Act expressly contemplates stricter state effluent and other limitations deemed necessary by the state . . . , allows states to incorporate those limitations into a state-issued permit, and authorizes a citizen suit to enforce those limitations." Upper Chattahoochee Riverkeeper Fund, Inc. v. City of Atlanta, 953 F. Supp. 1541, 1552 (N.D. Ga. 1996).

The citizen suit provision of the CWA authorizes the Riverkeepers to enforce the Buck Permit's dam safety provision through a citizen suit, and the Riverkeepers have standing to do so. Accordingly, the Court denies Duke Energy's request to dismiss the Riverkeepers' Dam Safety Claim.

Because each of the Riverkeepers' claims survives Duke Energy's challenge, Duke Energy's Motion to Dismiss Plaintiffs' Complaint with Prejudice is denied in its entirety.

## III. MOTION TO STAY

The Court now turns to Duke Energy's Motion to Stay. Given DENR's ongoing enforcement action in state court, the state legislature's enactment of CAMA, and the EPA's Coal Ash Disposal Rule, Duke Energy seeks to stay the proceedings in this case "to permit the regulatory, statutory and state enforcement [actions] to proceed," (Def.'s Stay Reply 1, ECF No. 32). It requests a stay until at least December 31, 2015, which is CAMA's deadline for DENR to develop proposed risk classifications for the coal ash lagoons. (Hr'g Tr. 25:2–7, ECF No. 44); see N.C. Gen. Stat. § 130A-309.213(a). Duke Energy's argument in support

of a stay rests on the primary jurisdiction doctrine and the Court's inherent power to stay proceedings.

### A.  Primary Jurisdiction Doctrine

In its initial briefing, Duke Energy relied exclusively on the primary jurisdiction doctrine as grounds for its motion to stay.  (See Def.'s Stay Mem. 7–14, ECF No. 24.)  The primary jurisdiction doctrine is "concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties."  United States v. Western Pacific R.R. Co., 352 U.S. 59, 63 (1956).  The doctrine applies when enforcement of a claim that is "originally cognizable in the courts . . . requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."  Id. at 63–64.  In such a case, the court can "enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling."  Reiter v. Cooper, 507 U.S. 258, 268 (1993).  "Notably, such a referral . . . 'does not deprive the court of jurisdiction . . . .'"  Smith v. Clark/Smoot/Russell, 796 F.3d 424, 431 (4th Cir. 2015) (quoting Reiter, 507 U.S. at 268).  Rather, the court "has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice."  Id. (quoting Reiter, 507 U.S. at 268–69).

The decision to refer an issue to an administrative agency is "a discretionary matter." Envtl. Tech. Council v. Sierra Club, 98 F.3d 774, 789 n.24 (4th Cir. 1996).  "No fixed formula exists for applying the doctrine of primary jurisdiction.  In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation."  Western Pacific, 352 U.S. at 64.  Identified decades ago by the Supreme Court and persisting today, these reasons and

purposes include "the desirable uniformity" that results when agencies make certain initial determinations and "the expert and specialized knowledge" of agencies. Id.; see, e.g., City of Osceola v. Entergy Ark., Inc., 791 F.3d 904, 909 (8th Cir. 2015); Consol. Rail Corp. v. Grand Trunk W. R.R. Co., 607 F. App'x 484, 491 (6th Cir. 2015); Beiler v. GC Servs. L.P., No. 1:13cv869, 2014 WL 5531169, at *2 (M.D.N.C. Nov. 3, 2014).

 "The doctrine has been deemed to apply in circumstances in which federal litigation raises a difficult, technical question that falls within the expertise of a particular agency." Piney Run Pres. Ass'n v. Cty. Comm'rs, 268 F.3d 255, 262 n.7 (4th Cir. 2001). In a case where construction workers were statutorily entitled to receive locally prevailing wages but a dispute arose regarding the appropriate wage, the Fourth Circuit noted it may be proper for the district court to refer the issue to the Department of Labor, which is responsible for setting prevailing wages. See Smith, 796 F.3d at 428, 431–32. The Fourth Circuit has also found it appropriate for the Federal Energy Regulatory Commission to investigate the causes of a natural gas shortage in a case involving a natural gas supplier's curtailment of natural gas deliveries to its customers. CF Indus., Inc. v. Transcon. Gas Pipe Line Corp., 614 F.2d 33, 34–36 (4th Cir. 1980). Agency expertise is not needed, however, "to adjudicate ultimate liability . . . since this responsibility rests solely on the court." See id. at 35–36.

 Here, the Riverkeepers' citizen suit does not present any issue requiring agency resolution. It calls on the Court to decide whether Duke Energy has violated its existing NPDES permit, a task entirely within the competence of this Court. See Raritan Baykeeper v. NL Indus. Inc., 660 F.3d 686, 691 (3d Cir. 2011) (explaining that Congress decided federal courts are competent to decide CWA cases "when it wrote the . . . CWA to authorize citizen

suits in federal courts").[13] As Congress indicated in the legislative history of the CWA, "[e]nforcement of pollution regulations is not a technical matter beyond the competence of the courts." S. Rep. No. 92-414, at 81. Moreover, DENR would not have authority to adjudicate Duke Energy's ultimate liability in this case, a responsibility belonging to the Court. See CF Industries, 614 F.2d at 36.

Duke Energy insists the Court should stay proceedings pending resolution of DENR's enforcement action in state court. (Def.'s Stay Mem. 7, ECF No. 24.) Such a stay would not enable a referral to DENR but would rather constitute a deferral to the state court. Duke Energy has cited no case where a court has applied the primary jurisdiction doctrine to stay a case so that a different court could resolve the matter instead, and the Court finds no such case. Moreover, Duke Energy has not explained why the state court would be more competent than this Court to decide issues purportedly requiring DENR's

---

[13] See also Pub. Emps. for Envtl. Responsibility v. Gipson Co., No. 3:15-0020, 2015 WL 4663173, at *3 (M.D. Tenn. Aug. 6, 2015) (refusing to stay a CWA citizen enforcement action under the primary jurisdiction doctrine because "determining whether Defendants have violated the terms of their permits or are releasing pollutants into a body of water in violation of the CWA . . . are exactly the types of things that Congress have determined federal courts competent to decide"); Pennenvironment v. GenOn Ne. Mgmt. Co., No. 07-475, 2011 WL 1085885, at *5 (W.D. Pa. Mar. 21, 2011) (finding the primary jurisdiction doctrine inapplicable partly because deciding whether the defendant had violated its NPDES permit "does not require the Court to make any determinations involving technical or policy considerations"); United States v. Citizens Utils. Co. of Ill., No. 92 C 5132, 1993 WL 286463, at *5 (N.D. Ill. July 28, 1993) (deeming the primary jurisdiction doctrine "simply inapplicable" in an action requiring the court to "merely determine" if the defendant was violating its NPDES permit); Nat. Res. Def. Council, Inc. v. Outboard Marine Corp., 692 F. Supp. 801, 809 (N.D. Ill. 1988) (noting that a determination of whether the defendant had violated its NPDES permit presented "no need to resolve issues 'within the special competence'" of the relevant agencies); Conn. Fund for the Env't v. Job Plating Co., 623 F. Supp. 207, 214–15 (D. Conn. 1985) (declining to apply the primary jurisdiction doctrine to "a straightforward enforcement action" under the CWA); Student Pub. Interest Research Grp. of N.J., Inc. v. Fritzsche, Dodge & Olcott, Inc., 579 F. Supp. 1528, 1537 (D.N.J. 1984) (explaining that a determination of whether the defendant had violated its existing NPDES permit was "fully within the Court's competence and jurisdiction"); cf. Anderson v. Farmland Indus., Inc., 45 F. Supp. 2d 863, 868 (D. Kan. 1999) ("A determination of whether defendant is violating Clean Air Act standards is certainly not within the 'special expertise' of the [state agency].").

expertise. The Court thus declines to stay proceedings pending resolution of the state court suit under the primary jurisdiction doctrine.

Duke Energy also informs the Court that it has applied for a modification to the Buck Permit "to address the seeps, discharges, and groundwater concerns at issue in this case," and it requests that the Court yield to DENR's permitting process. (Id.) While the permitting process is entirely within DENR's realm of expertise, the Riverkeepers have not challenged Duke Energy's application to modify its permit, and the Court fails to see how a potential permit modification impacts the Court's competence to decide the issues in this case. See Student Pub. Interest Research Grp. of N.J., Inc. v. Fritzsche, Dodge & Olcott, Inc., 579 F. Supp. 1528, 1537 (D.N.J. 1984) (declining to apply the primary jurisdiction doctrine where the defendant had filed a permit renewal application seeking an increase in effluent limitations).

Further, Duke Energy's reliance on Friends of Santa Fe County v. LAC Minerals, Inc., 892 F. Supp. 1333 (D.N.M. 1995), and Montgomery Environmental Coalition Citizens Coordinating Committee on Friendship Heights v. Washington Suburban Sanitary Commission, 607 F.2d 378 (D.C. Cir. 1979), is misplaced. Friends of Santa Fe involved a collateral attack on the state agency's permitting decisions. 892 F. Supp. at 1348. Here, the Riverkeepers do not challenge any provisions of the Buck Permit or DENR's permitting decisions.[14] Montgomery Environmental is also inapplicable. In that case, the defendant allegedly exceeded the volume of sewage it was permitted to treat at a sewage treatment plant pursuant to an agreement between the jurisdictions that used the plant. 607 F.2d at 379.

---

[14] Moreover, in Friends of Santa Fe, the court abstained from entertaining the plaintiffs' collateral challenge under the Burford abstention doctrine, not the primary jurisdiction doctrine. 892 F. Supp. at 1348.

While the case was pending before the district court, the EPA issued a NPDES permit governing discharges from the plant. Id. at 380. The EPA then commenced administrative proceedings to resolve several objections to the permit. Id. Because the administrative proceedings would resolve many of the technical questions relevant to the federal action and could make a decision from the courts unnecessary, the district court properly yielded primary jurisdiction to the EPA. Id. at 381–82. Unlike Montgomery Environmental, this case involves the enforcement of an existing NPDES permit, which does not involve technical questions within the special competence of the agencies. See Nat. Res. Def. Council, Inc. v. Outboard Marine Corp., 692 F. Supp. 801, 810 (N.D. Ill. 1988) (deeming the situation in Montgomery Environmental "totally different" from a situation involving "the enforcement of a permit that already sets the relevant effluent limits"); Conn. Fund for the Env't v. Job Plating Co., 623 F. Supp. 207, 215 (D. Conn. 1985) (distinguishing Montgomery Environmental from a case where the plaintiffs sought only to enforce an existing NPDES permit). The cases cited by Duke Energy do not alter the Court's conclusion that the primary jurisdiction doctrine does not warrant a stay on the facts of this case.

## B. Discretionary Stay

In its reply brief and at oral argument, Duke Energy lessened its emphasis on the primary jurisdiction doctrine and shifted the focus of its argument to the Court's inherent power to stay proceedings. (See Hr'g Tr. 63:12, ECF No. 44). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). This power, however, is not unbounded. Williford v. Armstrong World Indus., Inc., 715 F.2d 124, 127 (4th Cir. 1983).

Proper use of this authority requires the court to exercise its judgment "to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket." Maryland v. Universal Elections, Inc., 729 F.3d 370, 375 (4th Cir. 2013) (quoting United States v. Ga. Pac. Corp., 562 F.2d 294, 296 (4th Cir. 1977)). Courts have identified these various factors to include the interests of judicial economy, the hardship and inequity to the moving party in the absence of a stay, and the potential prejudice to the non-moving party in the event of a stay. See, e.g., White v. Ally Fin., Inc., 969 F. Supp. 2d 451, 462 (S.D. W. Va. 2013). The burden rests on the party seeking the stay to "justify it by clear and convincing circumstances outweighing potential harm" to the opposing party. Williford, 715 F.2d at 127; see Landis, 299 U.S. at 255 (explaining that "if there is even a fair possibility that the stay . . . will work damage to some one else," the party seeking the stay "must make out a clear case of hardship or inequity in being required to go forward"). If a stay is appropriate, the court must keep it "within the bounds of moderation." Landis, 299 U.S. at 256.

Here, the balance of factors weighs against staying these proceedings. A stay would allow Duke Energy's alleged violations to persist, resulting in the further alleged discharge of pollutants into the Yadkin River, High Rock Lake, and their tributaries. See Hawai'i Wildlife Fund, 24 F. Supp. 3d at 991 (recognizing that "further delay" in a Clean Water Act citizen suit would "result in the continued alleged discharge of pollutants into the ocean"). The coal ash wastes in the lagoons allegedly contain numerous toxic substances—including chromium, arsenic, lead, aluminum, boron, iron, sulfate, and manganese—that are harmful to human health and the environment. (Compl. ¶ 2, ECF No. 1.) A stay thus has the potential to substantially harm the environment and the individuals who live near the Buck

plant and draw their daily supply of water from allegedly contaminated wells. (See Tuch Decl. ¶ 9, ECF No. 1-3; Burnham Aff. ¶¶ 3, 9, ECF No. 1-4; Beaver Decl. ¶¶ 6, 9, ECF No. 1-7; see also Hr'g Tr. 29:1–6, ECF No. 44 (informing the Court that seventy-three families and landowners near the Buck plant have been told to stop drinking the water from their wells).) In addition, a stay would unnecessarily interfere with the Riverkeepers' "right to have [their] case resolved without undue delay." See Williford, 715 F.2d at 128. In the face of this potential harm and prejudice to the Riverkeepers and those they seek to protect, Duke Energy's briefing is silent on the issue of the hardship or inequity it would suffer if required to move forward with litigation.

Rather, Duke Energy argues that DENR's state enforcement action and "the machinations of CAMA" both have the potential to moot the Riverkeepers' claims, making it prudent to stay proceedings until December 31, 2015, at least.[15] (Hr'g Tr. 9:5–9; 24:25–25:4, ECF No. 44.) As earlier recognized by this Court, after two years of litigation in state court, DENR has yet to conduct any depositions, has agreed to stay its discovery of the defendant, and has moved to stay its own case. (Hr'g Tr. 33:23–24, 34:5–9, ECF No. 44; DENR's Mot. to Stay, ECF No. 46-1.) DENR's prosecution does not inspire confidence that its state court action will move expeditiously to a final resolution. Nor does DENR's action encompass each of the Riverkeepers' claims. Even if the Court were to stay proceedings, resolution of DENR's state court suit would not entirely dispose of the

---

[15] Duke Energy acknowledges that the stay may "need[] to remain in place" beyond December 31, 2015. (Hr'g Tr. 26:18–24, ECF No. 44.)

Riverkeepers' citizen suit.[16]  Given the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976), the Court declines to stay these proceedings pending resolution of DENR's state court suit.

Likewise, the Court is not persuaded that a stay is warranted pending CAMA implementation.  While the ultimate mandate of CAMA—a process that results in groundwater remediation and closure of the coal ash lagoons—overlaps with some of the Riverkeepers' requests for injunctive relief, the prospect of mootness is far from certain. Integral to the closure process is oversight by the Coal Ash Management Commission.  In March 2015, however, a three-judge panel of the North Carolina Superior Court held that the General Assembly violated the North Carolina Constitution by creating the Commission "as an independent instrumentality of the state, independent of each of the three branches of government." McCrory v. Berger, No. 14-CVS-015201, slip op. at 11–12 (N.C. Super. Ct. Mar. 16, 2015).  This holding places in question the current existence of the Commission and its ability to carry out its obligations under CAMA.  Duke Energy argues that for purposes of the risk classification process, "[i]t doesn't make any difference whether there's a Coal Ash Commission or not" because CAMA specifies that DENR's proposed classifications are deemed approved if the Commission fails to act within a certain amount of time.  (Hr'g Tr. 60:22–61:1, ECF No. 44 (referring to N.C. Gen. Stat. § 130A-309.213(c)).)

---

[16] Events that moot a citizen-plaintiff's claims for injunctive relief do not necessarily moot its claims for civil penalties.  See Friends of the Earth, 528 U.S. at 173–74 ("The appellate court erred in concluding that a citizen suitor's claim for civil penalties must be dismissed as moot when the defendant, albeit after commencement of the litigation, has come into compliance."); see also Powell v. McCormack, 395 U.S. 486, 496 n.8 (1969) ("Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests.").

However, when the General Assembly drafted this provision, it could not have envisioned a scenario where no Commission existed in the first place. The Court therefore does not presume to know how CAMA's statutory scheme will unfold without a functioning Commission. Given this uncertainty, the possibility that CAMA's requirements may moot the Riverkeepers' requests for injunctive relief is speculative at best. Duke Energy's requested end date for a stay of December 31st represents only the first of many deadlines in CAMA's lengthy implementation process,[17] and the Court is not convinced that the Riverkeepers' claims will become moot on that date merely because DENR will have taken the initial step of developing a proposed risk classification for Buck.

While judicial economy is one of the factors the Court must consider in granting a stay, when balanced against the potential harm to individuals and families, considerations of judicial economy must give way. Duke Energy has failed to carry its burden of justifying a stay by clear and convincing circumstances. Accordingly, the Court denies Duke Energy's Motion to Stay.

---

[17] By December 31, 2015, DENR must develop a proposed classification for Buck as high-risk, intermediate-risk, or low-risk. N.C. Gen. Stat. § 130A-309.213(a)–(b). Within thirty days of issuing its proposed classification, DENR must issue and give notice of a written declaration documenting its proposed classification. Id. § 130A-309.213(b). It then has sixty days to conduct a public meeting, and the public has at least twenty days afterwards to submit written comments. Id. § 130A-309.213(b)(3)–(4). DENR must then submit a proposed classification to the Commission within the next thirty days. Id. § 130A-309.213(c). This process can take up to 160 days—longer, if DENR provides more than twenty days for the public to submit written comments. The Commission must then approve DENR's proposed classifications. Id. Following the risk classification process, Duke Energy is required to submit a proposed closure plan for the Buck plant by the end of 2016, 2017, or 2018, depending on Buck's classification. Id. § 130A-309.214(a). DENR must review the plan, engage in a notice-and-comment process, and decide whether to approve the plan. Id. § 130A-309.214(b)–(c). If approved, the plan is submitted to the Commission for its review and approval. Id. § 130A-309.214(d). Only after the Commission gives its approval must Duke Energy begin to implement its plan and begin taking steps to close the coal ash lagoons at Buck. Id. § 130A-309.214(e). Depending on Buck's classification, the closure process can conclude in 2019, 2024, or 2029. Id. § 130A-309.214(a)(1)–(3).

For the reasons outlined herein, the Court enters the following:

**ORDER**

IT IS THEREFORE ORDERED that Duke Energy's Motion to Dismiss Plaintiffs' Complaint with Prejudice (ECF No. 20) is DENIED.

IT IS FURTHER ORDERED that Duke Energy's Motion to Stay (ECF No. 21) is DENIED.

This, the 20th day of October, 2015.

                    /s/ Loretta C. Biggs
                United States District Judge